## TIMES-REPUBLICAN PRINTING CO. et al. v. GIVEN.

(Circuit Court, S. D. Iowa, C. D. November 30, 1900.)

### No. 2,365.

CORPORATIONS—SALE BY SOLE OWNER OF STOCK—ESTOPPEL TO ASSERT RIGHTS AS CREDITOR.

Defendant owned all the capital stock of a newspaper and printing corporation, and managed its business as his own. The capital of the company was impaired, and, to meet the requirements of the business, defendant put in $8,000 in money. This amount was for a time carried on the books of the company as a credit in his individual account, but was afterwards transferred, with his knowledge, into the profit and loss account. Subsequently defendant sold the company, as a property, to another, to whom he transferred all the stock. The purchaser knew the facts in regard to the $8,000 and the recitals of the books, and nothing was said by defendant as to his being a creditor of the company for that amount. Held, that he must be regarded as having put the amount into the business of the company to make good to that extent its impaired capital, and not as a loan, but that, if considered as a loan, being the sole owner of the property and business, and having sold the same without any reservation, and received payment therefor, he thereby transferred all his rights therein, both as a stockholder and creditor, and was estopped to assert the rights of a creditor as against the purchaser, who bought in reliance on the recitals of the books, which constituted a virtual representation by defendant that he was not a creditor.

In Equity.

A. B. Cummins and T. Binford, for complainants.
J. R. Barcroft and J. M. Parker, for respondent.

McPHERSON, District Judge. Simply to advise counsel, all of whom may be absent when the decision of the case is announced in open court, I briefly present my views in writing.

There is pending in this court an action (No. 3,615, law) wherein Welker Given, respondent herein, is plaintiff, and the Times-Republican Printing Company, one of complainants herein, is defendant. The petition in the law action is in five counts. The first two counts declare upon two promissory notes, of date November and December, 1895, of the printing company, payable to Welker Given, aggregating $8,000. The third and fourth counts are based upon the allegations of money loaned by Given to the company in the same amounts and at the same dates as the alleged notes. These

counts, in other words, are upon the same causes of action as are counts 1 and 2. The fifth count is for an alleged balance due of $375 of salary. Mr. Given is a citizen of Illinois, and the company a corporation of Iowa. The company filed answer in substance the same as the bill in equity in this case. It was assumed, and correctly, that the answer presented an equitable defense, which accounts for this case, and the trial thereof, and a decree enjoining the trial of the law case. S. C. McFarland, a citizen of Iowa, is joined in this case as a complainant with the printing company. This case depends almost wholly upon controverted questions of fact. The questions of law are elementary, and require no discussion.

The printing company is, and for many years has been, engaged in the business of publishing a daily and weekly newspaper of general circulation at Marshalltown, Iowa, and part of the time a semiweekly paper, and doing job printing and binding. It is a corporation, composed of 260 shares of capital stock, of $100, par value, each, or $26,000 in the aggregate. Prior to 1893 McFarland owned all the capital stock. In the year 1893 McFarland sold all the capital stock to Given for $16,000, part of which Given paid for in cash. The balance was evidenced by a note payable to McFarland, signed by Given as principal and another party as surety, and was still further secured by the corporation stock as collateral security; Given retaining the right to vote the stock. Given owned all the stock, subject to the rights of McFarland as security for said note, until May, 1896. In May, 1896, Given sold all to McFarland. (1) Did he only sell all the capital stock to McFarland? (2) Did he sell the concern or plant to McFarland, placing McFarland in his position? (3) Immediately prior to the sale, whatever the sale was, was Given a creditor of the corporation, as well as a stockholder, in the sum of $8,000, on account of money loaned by him, and $375 balance of salary? (4) If a creditor, was the $8,000 evidenced by two notes? (5) If he were a creditor at the time of the sale to McFarland, is he now estopped from asserting his claims? Accordingly as these questions are answered, should the decree be. The evidence is voluminous. Part of it is material, some of it not much so, and part of it but incidental. It is not practical to point it all out in this memorandum. It was all read in my hearing, and parts of it again and again, and much of it I have again read. I believe it all to be in my mind.

It is not very material, as a question by itself, whether Given holds or did hold notes of the company for $8,000, because, if the company owes him that sum, and he is entitled to a judgment therefor, it is of no concern whether he have judgment on the notes or for the naked loan, excepting the difference of 2 per cent. in the rate of interest. But the question of notes or no notes has a substantial bearing upon the other questions. If two notes aggregating $8,000 were given to Given by the company, such notes were signed by affixing the corporation name, "by W. Given, President." I do not believe the notes were given, and I find that in fact they were not given. Given himself at times in his evidence is not certain about it. If he signed them, it was when other notes for other

purposes were signed, and when he was sick and in bed. The notes are not produced, and have never been seen during this litigation. His account of their loss is hazy and unsatisfactory to me. Given at times seems to be clear in his own mind about them, and at other times it seems more like a dream to him. He says if they were signed McFarland was present, and McFarland positively denies it. During the negotiations in May, 1896, notes to Given were never referred to. The accounts of Given on the books were never debited by reason of the notes. The book of bills payable has no entry showing the notes. The company had a bookkeeper, and from time to time financial statements and balance sheets were made by the bookkeeper, showing Given's account and all other matters, but these notes never appear. Given saw and retained many of these balance sheets and statements. From the time these notes are said to have been given until December, 1896, Given neither in conversation nor by correspondence referred to the notes; and yet during all of that time McFarland and Given were friends, and each extending courtesies to the other. In December, 1896, for the first time, McFarland was advised by Given's lawyer that he had the notes for collection. How can it be possible that the alleged notes were given? Given has confounded the matter with something else, and he is mistaken, and the notes were never given.

Did Given loan the company $8,000? That he advanced this sum is conceded. But why and on what account did he advance it? New machinery and fixtures and type, etc., were badly needed. Money was required. But one of two ways was open to raise the money: (1) Borrow it; (2) make good the impaired capital stock, because the stock was impaired. Given, but three years prior, bought the concern for $16,000, and yet it was capitalized at $26,000. Then the question is, was the money borrowed, or was the impaired stock made good? Given owned all the stock, and, aside from creditors, was the only interested person. If he retained full ownership of the stock, it was of no concern to him whether he loaned the money, or put it in the business and thereby made good the impaired stock. If he loaned the money, he would thereby, of course, become a creditor to that amount, and his capital stock would thereby be worth just that much less. Upon the dissolution or winding-up of the affairs of the corporation, Given would have exactly the same amount of money, whether the money was borrowed or used to make good the impaired stock. Therefore Given had no concern in the matter, and at no time prior to the consummation of the sale in May, 1896, to McFarland, could he have cared, if the corporation remained solvent, whether he made good his stock or loaned the money. And that the corporation was at all times solvent, apart from the capital stock, is a conceded fact, and was so shown by Given, McFarland, and all persons in charge of any department of its business. And, as Given had no concern in the question whether he loaned the money or made good the stock, he likewise was indifferent. McFarland all this time was taking part in managing the company's business. But he was also a creditor. He still held the note of Given for the purchase price. Four thousand dollars remained due

on this note. Given's corporation stock was held by McFarland as collateral security for this note. It is true, a Miss Ankeny was on the note as surety. It is also true, Given and McFarland had agreed in writing that McFarland could sue Miss Ankeny before exhausting the collateral. My recollection of the evidence is that Miss Ankeny had not so agreed. I do not stop to find and re-read that contract. But, if she did not so agree, then a court at her instance would have compelled McFarland to first exhaust the collateral security; to wit, the stock, and hold her only for the balance. But, in any event, McFarland was deeply interested in maintaining and even increasing the value of the stock; and Given was, at least morally, interested in protecting Miss Ankeny, his surety. So that I think it was to the interest of both, and, of course, to the detriment of neither, to have the $8,000 put in the business and maintain the stock, rather than make the loan. After a time the item was placed in the profit and loss account, and in this "junk pile" it remained. Given knew this. Statements in writing were made by the bookkeeper, and Given read them. The money was merged in the business. Given knew this and acquiesced in it. These statements thus made out, and which did not show Given to be a creditor, were either used by Given, or the same facts recited in such statements were given in conversation by Given to a Mr. Dotsen when Given was trying to sell out to Mr. Dotsen. And this within a day or so of the time of the sale in May, 1896, by Given to McFarland. Had the proposed sale in May, 1896, by Given to Dotsen been consummated, Dotsen would have made the purchase without the slightest intimation of Given being a creditor. And his knowledge would have been obtained from Given. Had he not known that Given was a creditor, if he were one, it would have been because of a concealment of material facts by Given. I do not believe there was a concealment of facts, because I find the $8,000 was not loaned, but was put in the business, and thereby making the capital stock good, or more nearly good, by that amount. These views dispose of the case so far as concerns this court.

But much evidence was taken and elaborate arguments made upon the questions of whether the sale in May, 1896, was of the stock, or whether McFarland stepped in the shoes of Given in all respects, and whether Given is estopped from asserting that he is a creditor. As to what Given sold to McFarland, the evidence shows that the stock was indorsed by Given, and the proper indorsements made on the stubs of the certificate book. In form, it was a sale of stock. Given since 1893 had owned all of the stock. McFarland now became the owner of all of it. Stockholders' meetings had not recently been held, and for a great many years had transacted nothing but formal business. The same is true as to the board of directors. Given owned and managed and operated the business, not as the head of a corporation, but as an individual. So had McFarland before him. The written proposition by Given to McFarland relates to the printing company as a property. It was this proposition that was accepted. Nothing was said about the stock, or its value per share; and no one knows now its value, or what it was at the time

of the sale, excepting by computation. Corporation stock, generally at least, is sold at so much on the dollar par value. I believe, and so find, that McFarland took the whole concern, and stepped into the shoes of Given in all respects, and took all rights held by Given. If he did, and if Given were both a stockholder and creditor, then McFarland became both the creditor and stockholder, and Given remained neither. And I offer but a few words as to estoppel. If Given were a creditor, but represented he was not, and on such representations the sale was made, he cannot recover, assuming that McFarland believed him to be no creditor. For a time the $8,000 was carried as a debit item on the books, or as a credit item under Given's name. Then it was changed to profit and loss account. Of course, by placing it in this account would not pay the debt. But it was placed there not simply for convenience, and not because if it were a debit item it could not be collected, but to merge it in the business. And this is the fact McFarland knew. The more it was urged by argument that McFarland knew the business, and knew the books and their recitals, the more it was emphasized in my mind that McFarland has the right to rely upon Given's being estopped. And this feeling has grown on me. Counsel say that McFarland cannot urge that Given is estopped, because McFarland knew of all recitals of the books; I hold that he can urge estoppel because he did know the books and their recitals. He knew that these books show just what is now claimed by him. And Given knew the same. He knew that the books no longer showed him to be a creditor. Such was the knowledge of them both. And with such knowledge the sale was made, and it became of no importance whether it was a sale of stock, or of the concern as a whole. He did not claim that he was a creditor in May, 1896, and it was too late to claim it in December, 1896. He remained silent in May, and in December and thereafter he must remain silent. It was strongly urged in argument that Given will become the loser. All regret this fact. But this is sentiment, and is not a valid reason upon which to base a decree. McFarland sold in 1893 for much less than the face value of the stock. Many a man lost, not part, but his all, between 1893 and 1896. During those terrible years to all, Given drew out about $8,000. Much of the time he was an invalid; part of the time seeking his health in a distant state. But, be this as it may, his contracts and his estoppel require me to hold that he must take that which he agreed to take, and which McFarland paid him. The rights of the Times-Republican Printing Company, and McFarland as well, as shown by the evidence, require me to hold that they are entitled to a decree favorable to them, all of which is accordingly ordered. A form of decree will be prepared by counsel for the printing company and McFarland. It will be submitted to Given's counsel. Such form, with approval or objections, will then be given to me. I will then sign and order of record a decree in the case.